<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| MISON LEE and SEMOK LEE, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.   02-5658 (JAG) |
| | : | |
| v. | : | |
| | : | |
| KINNELON GOURMET FARM, INC. | : | **OPINION** |
| and GEN SUNG PARK, | : | |
| | : | |
| Defendants. | : | |

<u>**GREENAWAY, JR., U.S.D.J.**</u>

**INTRODUCTION**

Plaintiffs Mison Lee and Semok Lee bring this action for default on a loan against Kinnelon Gourmet Farm, Inc. and Gen Sung Park ("Mr. Park").  Plaintiffs contend that they are owed $430,000 and accrued interest because Defendants defaulted on a loan.  Defendants claim that the money received was an investment, not a loan.  A bench trial was held on June 1, June 8, and July 19, 2005.  Upon hearing the evidence presented at trial, this Court finds that Defendants have defaulted on Plaintiffs' loan, and judgment will be entered in favor of Plaintiffs in the amount of $370,000.

**BACKGROUND**

Plaintiffs Mison Lee and Semok Lee (collectively "Plaintiffs" or "the Lees") are New York residents; they are wife and husband, respectively.  Plaintiffs are owners of a trucking company known as "Lee 77" which services fruit and vegetable markets in and around the New

York metropolitan area. Defendant Gen Sung Park is a New Jersey resident. In March of 2001, Mr. Park formed and incorporated in New Jersey Defendant Kinnelon Gourmet Farm, Inc. ("Kinnelon Farm"), a fruit and vegetable market. Mr. Park also owns other fruit and vegetable markets in New Jersey.

On November 27, 2002, Plaintiffs filed the Complaint in the instant action, alleging that they loaned Defendants $430,000, and that, on March 15, 2002, Defendants made and delivered to Plaintiffs an enforceable promissory note in which Mr. Park agreed to repay the loan in full. Plaintiffs allege that Defendants have failed to make the installment payments required by the note. Plaintiffs demand the amount of the promissory note ($430,000.00), less the $60,000 repaid prior to default, plus interest and costs of suit.

Defendants answered the Complaint on March 28, 2003, raising the following affirmative defenses: 1) Plaintiffs' claims are barred by equitable estoppel and other equitable doctrines; 2) Plaintiffs' claims are barred by the doctrine of economic duress; 3) Plaintiffs' claims are barred because of a lack of consideration; 4) Plaintiffs' claims are barred by Plaintiffs' breach of agreements between the parties; 5) Plaintiffs' claims are barred by the doctrine of accord and satisfaction; 6) Plaintiffs' claims are barred for failure to state a claim for which relief can be granted; 7) Plaintiffs' claims are barred because the contracts alleged in the complaint are unenforceable.

Defendants made three counterclaims. Count I seeks a declaratory judgment that: 1) the note is void and unenforceable; 2) Mison Lee is a 40% shareholder of defendant Kinnelon Gourmet Farm, Inc.; and 3) the rights and obligations of the parties are stated under the shareholder agreement for Kinnelon. Defendants also asked that the Court award them attorney

fees, costs of suit, and any other equitable relief the Court deems just.  Under Count II, Defendants allege that Plaintiffs breached their obligation of good faith and fair dealing.  Under Count III, Defendants seek a declaratory judgment that Plaintiffs' misconduct constitutes a material breach of the contract.

The central issues to be resolved by this Court at trial are: 1) whether the initial transfer of $200,000 from the Lees to Mr. Park was a loan or an investment; and 2) whether subsequent transactions in which the Lees gave Mr. Park $230,000 should be considered loans or investments.

## STANDARDS

**A.     New Jersey law on interpretation of a promissory note**

New Jersey courts interpret promissory notes using the principles of contract interpretation.  See, e.g., New York State Higher Educ. Servs. Corp. v. Lucianna, 284 N.J. Super. 603, 608 (N.J. Super. Ct. App. Div. 1995).  "Interpretation and construction of a contract is a matter of law for the court."  Young v. Prudential Ins. Co. of Am., 297 N.J. Super. 605, 621 (N.J. Super. Ct. App. Div. 1997).  New Jersey courts have long held that when the terms of a contract are clear, courts enforce the contract as written.  Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960).

**B.     New Jersey law of economic duress**

"Economic duress occurs when the party alleging it is the victim of a wrongful or unlawful act or threat, which deprives the victim of his [or her] unfettered will. . . . [T]he decisive factor is the wrongfulness of the pressure exerted."  Muhammad v. County Bank of Rehoboth Beach, 379 N.J. Super. 222, 240 (N.J. Super. Ct. App. Div. 2005).

### C. New Jersey law on adequacy of consideration

"Inadequacy of consideration standing alone has often been said to be insufficient to avoid specific performance of an otherwise valid agreement. . . . Nevertheless there are decisions in our State and elsewhere which support the doctrine that if the inadequacy of the consideration is so gross as to shock its conscience, the court will decline to enforce the agreement upon the ground that such inadequacy amounts to conclusive evidence of fraud." De Caro v. De Caro, 13 N.J. 36, 44 (1953). Generally, a defense of inadequacy of consideration will be denied where a contract "was not accompanied by any artifice or deception, lack of independent advice, abuse of confidential relation, or similar indicia generally found in the reported instances where equity has declined to enforce, as unfair or unconscionable, an agreement voluntarily executed by the parties." Id. It is only where the inadequacy of consideration is "shocking" that refusal to enforce an agreement is justified. Id. at 45.

### THE EVIDENCE AT TRIAL

### A. Testimony of Semok Lee

Mr. Lee testified through an interpreter. He stated that he made deliveries to one of Mr. Park's stores during 2000 and 2001. (Tr. 19.) At some point in 2001, Mr. Lee heard that Mr. Park wanted to open a third store and was in need of money, and he offered to loan Mr. Park some money. (Tr. 20.) In August of 2001, he and his wife met Mr. Park and his wife at a restaurant called Yung Bin Wan, where Mr. Lee gave Mr. Park $200,000.00 in cash. (Id.) He identified the document marked as Plaintiffs' Exhibit 4 as a writing signed by Mr. Park at that meeting. (Tr. 21.) The document is written in Korean, and Mr. Lee read it: "I borrowed $200,000 from Semok Lee and Mison Lee, couple. I promise to keep my promise and I also

promise to return the money." (Tr. 22.)  He identified the document marked as Plaintiffs' Exhibit 6 as a check for $200,000, post-dated December 31, 2001, that Mr. Park gave to Mr. Lee at the meeting. (Tr. 22-23.)  There was no talk at the meeting about the Lees being investors in Mr. Park's stores. (Tr. 22.)  Mr. Lee believed that Mr. Park implied that, in return for the loan, Mr. Park would use the Lees' business to deliver to the new store. (Tr. 23.)  At some point, Mr. Lee gave the check to a wholesaler, who tried to deposit it, but the bank would not honor it.[1] (Tr. 51-52.)

    Mr. Lee said that, after the initial payment of $200,000, Mr. Park approached him to ask for more money. (Tr. 23.)  He transferred an additional $230,000 in several installments to Mr. Park. (Tr. 23.)  Mr. Lee identified the document marked as Plaintiffs' Exhibit 5 as a promissory note made by Mr. Park to the Lees. (Tr. 24.)  Mr. Lee saw Mr. Park prepare the note on his computer on December 11, 2001. (Tr. 24.)  Mr. Lee read the note: "Credit Lee, Mr. Gen Sung Park.  The amount, $430,000.  This amount includes the $20,000 received on August 2, 2001.  Therefore, the check issued by California Farm or promissory note issued prior would be invalid.  Debtor shall repay at his earliest convenience, and all the planning and condition would be notified to the creditor within three months.  December 11, 2001.  Creditor, Semok Lee.  Debtor, Gen Sung Park." (Tr. 25-26.)  Mr. Lee and Mr. Park then signed the note. (Tr. 26.)  Mr. Lee stated that the reference to "$20,000" was a typographical error and that it should have read "$200,000." (Tr. 27.)  He denied using any threats to force Mr. Park to sign the note. (Tr. 26.)

---

[1] Defendants' counsel stipulated that the check had been deposited and payment was stopped, as regarding the wholesaler. (Tr. 120.)

5

He never received a shareholders' agreement, nor did Mr. Park ever say that he would become a partner or shareholder in his business. (Tr. 27.)

Mr. Lee identified the document marked as Defendants' Exhibit 1 as a note that, he understood, had been signed by Mr. Park in March (of 2002). (Tr. 36.) Mr. Lee said that the note stated that Mr. Park would pay him $20,000 per month, and that Mr. Park made three such payments to him. (Tr. 36.)

### B. Testimony of Mison Lee

Mrs. Lee stated that Mr. Lee told her that Mr. Park needed money to open a new store, and that he expected that their business would deliver to the store. (Tr. 58.) She also anticipated that their company would deliver to Mr. Park's stores. (Tr. 60.) Mrs. Lee drafted the writing that Mr. Park signed at the August, 2001 meeting, promising to repay the $200,000. (Tr. 58.) Mrs. Lee identified the document marked as Plaintiffs' Exhibit 4 as this writing, signed by Mr. Park at the meeting. (Tr. 59.) The Lees transferred $200,000 in cash to Mr. Park at the meeting. (Id.)

Approximately one month after the August meeting, Mr. Park said that he needed more money, and the Lees transferred an additional $100,000. (Tr. 60.)

Mrs. Lee has received no profits from Mr. Park's business. (Tr. 75.) Mrs. Lee has never heard any discussion of becoming a partner in Mr. Park's business, nor did she hear of or sign any documents relating to being a shareholder in the business. (Tr. 61.) She did not know of her husband's signing any such documents. (Id.) Mrs. Lee did sign documents in connection with buying a van for Mr. Park's business. She went with Mr. Park to a Honda dealer in Paramus to purchase the van and saw that one document listed her as a vice president of Kinnelon Farm Company. (Tr. 64.) She stated that she was upset, but nonetheless co-signed on the purchase of

6

the vehicle by Kinnelon Farm Company.  (Tr. 64.)   Mrs. Lee also signed documents relating to the purchase of a Lincoln Navigator for Mr. Park.  (Tr. 91.)  She signed one document that listed her as an employee of Kinnelon Gourmet Farm, Inc.  (Tr. 93.)

In March of 2002, Mrs. Lee went to a meeting with Mr. Park at the office of attorney Sharon Hong.  (Tr. 76.)  At the meeting, Mr. Park signed a promissory note.  (Tr. 77.)  Mrs. Lee identified the document marked as Plaintiffs' Exhibit 1 as this promissory note.  (Id.)  The note stated that Mr. Park would repay the loan of $430,000, with provisions about the interest rate and late charge.  (Tr. 77.)  Mr. Park did not sign the note under pressure of any threats or force.  (Id.)  Subsequent to the signing of this note, Mr. Park made three payments of $20,000 each.  (Tr. 79.)

### C. Testimony of Hong Kyu Chun

Hong Kyu Chun testified through an interpreter.  He knew the Lees through his position in the Korean Produce Association.  (Tr. 99.)   He attended the meeting at Sharon Hong's office at which Mr. Park signed the promissory note.  (Tr. 104.)  Mr. Chun identified the document marked as Plaintiffs' Exhibit 1 as this promissory note.  (Tr. 105.)  He did not observe the use of any pressure on or threat to Mr. Park to obtain his signature.  (Tr. 106.)

### D. Testimony of Hae Sung Park

Hae Sung Park testified through an interpreter.  Mrs. Park has been married to Defendant Gen Sung Park for five years.  (Tr. 122.)  She stated that when her husband was about to open a third store, the Lees told him that he could use their money with no interest.  (Tr. 126.)  Mrs. Park suggested the initial lunch meeting, which she attended with her husband and the Lees.[2]

---

[2] Mrs. Park testified inconsistently when she later stated that she came to the lunch because her husband told her to do so.  (Tr. 145.)

(Tr. 126.)   She stated that the Parks received $200,000 from the Lees.  (Tr. 146.)  The $200,000 was borrowed from Mr. Lee.  (Tr. 129.)  All parties understood that this was a loan.[3]  (Tr. 146-147.)  Mrs. Park identified the document marked as Plaintiffs' Exhibit 6 as the $200,000 check that was given to the Lees at this meeting.  (Tr. 145.)   Mrs. Park said that, after this meeting, she did not see the Lees again until a meeting at the beginning of 2002.  (Tr. 127.)

Mrs. Park did not testify clearly about her understanding of whether there was a partnership in the Kinnelon store.  At one point, Mrs. Park stated that she believed that Mr. Lee and Mr. Park were partners in the Kinnelon store.  (Tr. 135.)  At another point, she stated that, at the time of the August, 2001 meeting, she understood that the money was a loan, but later she heard that the Lees would become partners with the Parks.  (Tr. 146.)  Mrs. Park went to an attorney, Edward Kiel, who prepared documentation related to a partnership in the Kinnelon store between Mrs. Lee and Mr. Park.  (Tr. 136, 138; Defendants' Exhibit 6.)  When asked whether this attorney prepared a shareholder's agreement to put Mr. Lee's name into the corporation, she agreed.  (Tr. 138.)   She believed that the Lees had signed this shareholder's agreement.  (Tr. 148.)

Mrs. Park said that her husband expressed fear of going to jail, but she did not ask him for the reasons for this fear.  (Tr. 140.)  Many people told her that her husband could go to jail for not paying back a loan.  (Tr. 141.)  She learned from him that it had to do with the bounced check for $200,000.  (Tr. 143.)

---

[3]Mrs. Park contradicted herself, saying later that it was not a loan.  (Tr. 148.)

### E.     Testimony of Sharon Hong

Ms. Hong testified that she is an attorney and that she drafted the promissory note signed by Mr. Park when, on March 15, 2002, he met in her office with Mrs. Lee. (Tr. 157; Pls.' Ex. 1.) Mr. Park raised no objection to signing the note. (Tr. 159.)

### F.     Testimony of Marc Potolsky

Mr. Potolsky testified that he is an attorney and that, on November 19, 2001, Mrs. Park asked him to prepare a stockholder's agreement for a corporation. (Tr. 178.) The agreement was to state that Mr. Park would own 60% of the shares and Mrs. Lee would own 40% of the shares. (Id.) Mr. Potolsky drafted the agreement and mailed it to Mr. Park on December 4, 2001. (Tr. 181.) Mr. Potolsky did not know whether the agreement was ever signed or otherwise consummated. (Tr. 184.) He has never spoken to either Mr. or Mrs. Lee. (Tr. 186.)

### G.     Testimony of Gen Sung Park

Mr. Park testified through an interpreter. Mr. Park stated that, in the months prior to August of 2001, Mr. Lee had made deliveries to a store of his, at which time they talked about Mr. Park's business ideas. (Tr. 200.) On one occasion, Mr. Lee said both that Mr. Park could use his money, and that he was interested in becoming a partner in Mr. Park's next store. (Tr. 201.) When Mr. Park received the $200,000 in August of 2001, he understood that it was a loan. (Tr. 201, 283.) At the time that he received the $200,000, he gave the Lees a check for $200,000, which he identified as Defendants' Exhibit 1.[4] (Tr. 201.) He expected that he would repay Mr.

---

[4]Mr. Park later stated that, months later, he believed the check did not exist. (Tr. 235.) When asked how he could believe this, since he gave the Lees the check, he first said that the Lees had said there was no check, and then said the Lees might have lost the check. (Id.) At another point, he stated that "Mr. Lee or Mrs. Lee said that they lost the check." (Tr. 249.)

Lee by December 31, 2001.  (Tr. 202.)   Mr. Park identified Defendants' Exhibit 2 as the document he signed at the August, 2001 meeting, and stated that he did not object to signing it. (Id.)

Although Defendants' counsel stipulated that Mr. Park stopped payment on the $200,000 check when it was eventually deposited, Mr. Park gave conflicting testimony on this matter.  At one point, Mr. Park testified that the bank had contacted him and informed him that they bounced the check. (Tr. 244.)  Later, he stated that he had stopped payment on the check. (Tr. 248.)  He also stated that it was not true that there wasn't money to pay the check in the account. (Tr. 249.)

Mr. Park stated that, subsequent to the August meeting, Mr. Lee told him that Mrs. Lee wanted to become a partner in the store. (Tr. 205.)  The Lees met with Mr. Park at a Dairy Queen in October of 2001 to discuss a potential partnership. (Tr. 207.)  They discussed the Lees' contributing an additional $200,000, with Mrs. Lee owning 40% of the store. (Tr. 207, 208.) Over the next two weeks, the Lees gave him the additional $200,000. (Tr. 209.)  At the Dairy Queen meeting, they discussed the purchase of vehicles for the business, and Mrs. Lee told Mr. Park the identifying information about her that he wrote down on the slip of paper he identified as Defendants' Exhibit 3. (Tr. 210.)  Mr. Park wanted to use Mrs. Lee's credit for the purchase of the vehicles because he believed that his credit was not as good. (Tr. 290.)  Other than signing for the purchase of the vehicles, Mrs. Lee's only actions as partner were to come to the store occasionally. (Tr. 294.)  Although Mr. Park believed Mrs. Lee to be a partner, he has sent her only one document about the store, in March of 2002, and none since. (Tr. 295.)

Mr. Park identified Defendants' Exhibit 6 as the contract between Mrs. Lee and himself for the partnership. (Tr. 223.)  He gave a copy of this Stockholder's Agreement to Mr. Lee.  (Tr.

10

223.)  He understood that Mr. Lee would take it home to discuss with his wife and review with an attorney, before returning it to him.  (Tr. 224.)

Mr. Park identified Defendants' Exhibit 7 as the document he prepared on December 11, 2001, which said that he would repay $430,000 to Mr. Lee.  (Tr. 225, 227.)  He identified Defendants' Exhibit 9 as the promissory note he signed at Sharon Hong's office on March 15, 2002.  (Tr. 236.)  Mr. Park stated that he signed the note because he thought that he didn't have a choice.  (Tr. 237.)  He believed that, if he did not sign it, he would go to jail for bouncing the check.  (Tr. 238.)  In the period after signing the note, he made three payments to Mr. Lee.  (Tr. 262.)

## DISCUSSION

The parties dispute neither the authenticity of the three writings memorializing the loan agreement, nor the meaning of the words used in them.  Defendants argue, rather, that this Court should accept testimony to vary or contradict the plain language of the agreements.  New Jersey follows the parol evidence rule, which bars introduction of such evidence.  "The parol evidence rule of contract law stands for the principle that parol evidence cannot be introduced to create, vary or contradict a term of a contract not otherwise present in the written agreement."  Odatalla v. Odatalla, 355 N.J. Super. 305, 313 (N.J. Super. Ct. Ch. Div. 2002).  See also Seidenberg v. Summit Bank, 348 N.J. Super. 243, 256 (N.J. Super. Ct. App. Div. 2002) (under the parol evidence rule, evidence of oral promises is inadmissible to vary or alter the express words of a written agreement).  As such, even if this Court were persuaded that the parties made oral promises to treat the loans as investments – which it is not – the parol evidence rule bars the use of such evidence to alter the express words of the loan agreements.

Moreover, even setting aside the operation of the parol evidence rule, there are too many inconsistencies in Defendants' testimony about the alleged partnership for this Court to find the Parks credible as witnesses. Both Mr. Park and Mrs. Park testified that, when they received the $200,000 in August of 2001, they understood that the money was a loan.[5] Mrs. Park's testimony as a whole contained many inconsistencies, particularly on the matter of exactly which people were the partners: this changed with nearly every telling. Mr. Park testified that he believed that he and Mrs. Lee were partners in the Kinnelon store, but that he has only sent her one document regarding the store. This is not credible. Mr. Park also contradicted himself on the question of whether he or his bank caused the bank to refuse to pay the $200,000 check.

### FINDINGS OF FACT

Having heard the trial testimony of these witnesses, this Court now makes the following findings of fact and conclusions of law:

1. Plaintiffs Mison Lee and Semok Lee are wife and husband, respectively, residing at 43 Center Court, Roslyn Heights, New York, and are owners of "Lee 77," a trucking company that delivers produce to fruit and vegetable markets.

2. Defendant Gen Sung Park is a New Jersey resident. In 2001, Mr. Park formed and incorporated a fruit and vegetable market, known as Defendant Kinnelon Gourmet Farm, Inc.

3. On August 2, 2001, Mr. and Mrs. Park met with Plaintiffs at a restaurant and Plaintiffs loaned Mr. Park $200,000, paid in cash.

4. At the meeting on August 2, 2001, Mr. Park signed and gave Plaintiffs a post-dated check in the amount of $200,000 and wrote a note which reads: "I borrowed $200,000 from Semok Lee and Mison Lee, couple. I promise to keep my promise

---

[5] This is entirely inconsistent with Defendants' Trial Brief, which states that the initial loan of $200,000 was made "with the understanding that it would be considered a capital contribution if Park developed a fourth store." (Defs.' Trial Br. 4.) Defendants' counsel repeated this theory in his Opening Statement at trial. (Tr. 8.)

        and I promise to return the money." (Defendants' Exhibit 2, translated from Korean at Tr. 22.)

5. In consideration for the loan, Plaintiffs expected to have exclusive distribution rights to the new store, Kinnelon Farm.

6. In October of 2001, Plaintiffs transferred to Mr. Park an additional sum of $200,000 in cash.

7. In November of 2001, Plaintiffs transferred to Mr. Park an additional sum of $30,000.

8. On December 11, 2001, Mr. Park executed a note stating that he agreed to repay to Plaintiffs a $430,000 loan. (Defendants' Exhibit 7, translated from Korean at Tr. 25-26.)

9. On March 15, 2002, the parties executed a formal Promissory Note in which Mr. Park agreed to repay to Plaintiffs a loan of $430,000. (Defendants' Exhibit 9.) The Promissory Note was executed in New Jersey.

10. Mr. Park freely signed the three documents memorializing the loan. (Defendants' Exhibits 2, 7, and 9.)

11. Mr. Park began repayment of the loan in accordance with the terms of the March 15, 2002 Promissory Note.

12. Mr. Park repaid $60,000 of the debt owed, pursuant to the March 15, 2002 Promissory Note.

13. Mr. Park defaulted on the March 15, 2002 Promissory Note.

14. According to the terms of the March 15, 2002 Promissory Note, Mr. Park has an outstanding debt, totaling principal and interest of $370,000.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over this dispute based on diversity of citizenship of the parties, pursuant to 28 U.S.C. § 1332.

2. The parties accept this Court's personal jurisdiction.

3. The parties accept that venue lies in this district.

4. Neither party has argued that the relevant law of the interested states is in conflict or will affect the outcome of this suit. This Court will apply New Jersey law.

5. The handwritten note drafted by Mr. Park on August 2, 2001 is clear and unambiguous.

6. The handwritten note is an expression of the agreement reached by Plaintiffs and Mr. Park.

7. Pursuant to the note, Mr. Park agreed to repay a loan of $200,000.

8. This Court finds that the second note of December 11, 2001 is clear and unambiguous.

9. The second note is an expression of the agreement reached by Plaintiffs and Mr. Park.

10. The March 15, 2002 Promissory Note is clear and unambiguous.

11. The March 15, 2002 Promissory Note is an expression of the agreement reached by Plaintiffs and Mr. Park.

12. The initial transfer of $200,000 was a loan from Plaintiffs to Defendants. It was understood by all parties that the $200,000 was to be repaid.

13. The subsequent transfers totaling $230,000 constitute loans from Plaintiffs to Defendants. It was understood by all parties that the additional $230,000 was to be repaid by Defendants.

14. Defendants failed to prove that Mr. Park signed any of the writings under duress.

15. The parties' agreement was supported by an exchange of adequate consideration.

16. The loan agreement between the parties is valid and enforceable.

17. Defendants failed to prove that Plaintiffs breached the agreement, as to either its express terms or the implied covenant of good faith and fair dealing.

18. A judgment shall be entered in favor of Plaintiffs in the amount of $370,000.00.

An appropriate Order is attached.

                                          S/Joseph A. Greenaway, Jr.
                                          JOSEPH A. GREENAWAY, JR., U.S.D.J.

Dated:   February 28, 2006